**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TALKDESK, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-01699-RGA |
| | ) | |
| MITEL NETWORKS | ) | JURY TRIAL DEMANDED |
| (INTERNATIONAL) LTD. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MITEL NETWORKS (INTERNATIONAL) LTD.'S ANSWER, AFFIRMATIVE**
**DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT**

Defendant Mitel Networks (International) Ltd. ("Mitel") answers the Complaint of

Plaintiff Talkdesk ("Talkdesk") as follows:

**INTRODUCTION**

In 2019, Mitel and Talkdesk entered into a contract in which Talkdesk agreed to partner

with Mitel in offering certain integrated services to Mitel's customers.  Shortly thereafter and

during the entirety of its business relationship, Talkdesk breached multiple obligations under its

contract with Mitel. Specifically, Talkdesk:

- Failed to deliver multiple products and services that are key parts of the Integrated Services to be delivered as required by the Agreement;

- Provided products with significant delays, causing harm to Mitel and its customers;

- Refused to provide Mitel with its full product offering throughout the first year the Agreement and afterwards, thereby preventing Mitel from reaching annual targets contemplated by the parties' contract; and

- Unlawfully competed with Mitel by offering products Talkdesk refused to provided to Mitel to lure current and potential customers away from Mitel for its own profit.

These failures directly and materially affected Mitel's ability to provide the excellent service for which it is known and hindered Mitel's ability to compete in the market.

Mitel attempted to save its substantial time and monetary investment in the Talkdesk relationship by amending the agreement. Unfortunately, Talkdesk continued to skirt its responsibilities and also violated the terms of the amended agreement by missing deadlines and failing to provide vital integration services. As a result of these material contract breaches and unlawful conduct, Mitel was absolved of any obligation to pay Talkdesk any compensation originally contemplated by the parties' contract and was authorized to terminate the contract under Delaware law.  Further, Mitel is entitled to recover all damages it has suffered because of Talkdesk's improper competitive behavior.  Mitel therefore brings the counterclaims discussed below to vindicate its rights.

## ANSWER

1.      As Paragraph 1 of the Complaint attempts to characterize the nature of the action and the claims set forth in the Complaint, no response is required.  To the extent a response to Paragraph 1 of the Complaint is required, Mitel denies each and every allegation set forth in Paragraph 1 of the Complaint except that it admits that Mitel and Talkdesk entered into the Agreement, denies any characterization of the Agreement inconsistent with its terms, and refers to the Agreement for its terms.

## THE PARTIES

2.      Admitted.

3.      Admitted.

## JURISDICTION AND VENUE

4.      Mitel admits that this Court has subject matter jurisdiction over this dispute.

5.      Admitted.

6.      Admitted.

**FACTUAL ALLEGATIONS**

7.      Mitel admits that Talkdesk provides a cloud contact center solution that offers an enterprise call center as a service ("CCaaS") solution.  Otherwise, denied.

8.      Mitel admits that it manufactures telecommunications equipment, including cellular phones, servers, conferencing units, communication software, cloud-based services, and messaging systems.

9.      Mitel admits that it entered into the "Master Reseller Agreement" dated January 31, 2019 (the "Agreement") with Talkdesk.

10.      Mitel denies each and every allegation set forth in Paragraph 10 of the Complaint, denies any characterization of the Agreement that is inconsistent with its terms, and refers to the Agreement for its terms.

11.      Mitel admits that the parties executed the Amendment effective as of April 1, 2020.  Otherwise, Mitel denies each and every allegation set forth in Paragraph 11 of the Complaint, denies any characterization of the Agreement or Amendment inconsistent with their terms, and refers to the Agreement and Amendment for their terms.

12.      Mitel denies each and every allegation set forth in Paragraph 12 of the Complaint.

13.      Mitel denies each and every allegation set forth in Paragraph 13 of the Complaint.

14.      Mitel denies each and every allegation set forth in Paragraph 14 of the Complaint.

15.      Mitel admits that it sent a letter to Talkdesk on October 2, 2020 terminating the Agreement but otherwise denies each and every allegation set forth in Paragraph 15 of the Complaint.

16.   Mitel denies each and every allegation set forth in Paragraph 16 of the Complaint.

## FIRST CAUSE OF ACTION
## Breach of Contract

17.   Mitel incorporates by reference its responses to paragraphs 1–16 of the

Complaint.

18.   Mitel denies each and every allegation set forth in Paragraph 18 of the Complaint.

19.   Mitel denies each and every allegation set forth in Paragraph 19 of the Complaint.

20.   Mitel denies each and every allegation set forth in Paragraph 20 of the Complaint.

21.   Mitel denies each and every allegation set forth in Paragraph 21 of the Complaint.

22.   Mitel denies each and every allegation set forth in Paragraph 22 of the Complaint.

23.   Mitel denies each and every allegation set forth in Paragraph 23 of the Complaint.

24.   Mitel denies each and every allegation set forth in Paragraph 24 of the Complaint.

## SECOND CAUSE OF ACTION
## Declaratory Judgment

25.   Mitel incorporates by reference its responses to paragraphs 1–24 of the

Complaint.

26.   Mitel denies each and every allegation set forth in Paragraph 26 of the Complaint.

27.   Mitel admits that it has terminated the Agreement but otherwise denies each and

every allegation set forth in Paragraph 27 of the Complaint.

28.   Paragraph 28 recites claim language and therefore seeks legal conclusions to

which no answer is required.  Otherwise, denied.

29.   Paragraph 29 recites claim language and therefore seeks legal conclusions to

which no answer is required.  Otherwise, denied.

**PRAYER FOR RELIEF**

To the extent the Complaint's "WHEREFORE" provisions request relief to which
Talkdesk believes it is entitled, no response is required.  To the extent a response to the
Complaint's "WHEREFORE" provisions is required, Mitel denies that Talkdesk is entitled to
any relief sought in the Complaint including, without limitation, the relief requested in the
"WHEREFORE" provisions.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Talkdesk's claims for relief are barred, in whole or in part, for failure to state a claim
upon which relief can be granted.

### Second Affirmative Defense

Talkdesk's claims for relief are barred by the terms of the Agreement and the terms of the
Amendment.  These terms include, but are not limited to:

1.  The terms of the Amendment that relieve Mitel from paying any annual minimum
commitment allegedly owed if Talkdesk is in breach of any of its obligations under the
Agreement, including, without limitation SLAs and support obligations.

2.  The terms of the Amendment that relieve Mitel from paying any minimum
commitments allegedly owed for Years 2 and 3 if the integration described in Exhibit C is not
available for general commercial release by January 31, 2020 and limiting any such amounts to
what the parties agree to in good faith.

3.  The limitation of liability provisions of the Agreement in at least Section 21(b), bars
the amount of damages sought by Talkdesk.  Further, the exception for Mitel Fees under Section
13 does not apply because the definition for Mitel Fees does not include any alleged minimum
commitments.

### Third Affirmative Defense

Talkdesk's claims for relief are barred, in whole or in part, by its own conduct including its breaches of the Agreement and failure to satisfy its obligations under the Agreement.

### Fourth Affirmative Defense

Talkdesk's claims for relief are barred, in whole or in part, by the equitable doctrine of unclean hands.

### Fifth Affirmative Defense

Talkdesk's claims for relief are barred, in whole or in part, because it has failed to act in good faith.

### Sixth Affirmative Defense

Talkdesk's claims for relief are barred, in whole or in part, because it has not suffered any damages as a result of any actions taken by Mitel, and Talkdesk is thus barred from asserting any cause of action against Mitel.

### Additional Affirmative Defenses

Any relief sought by Talkdesk against Mitel may be barred, in whole or in part, by additional defenses that cannot now be articulated because of the generality of Talkdesk's pleading, the fact that discovery has not yet been taken, and other presently undeveloped information.  Accordingly, Mitel reserves the right to supplement the foregoing defenses and to raise additional defenses as may appear as the case progresses to the full extent allowed by law. Thus, the omission of any such additional defenses at this time is not intended to be a waiver of any such additional defenses.

## COUNTERCLAIMS

Counterclaim-Plaintiff Mitel, by and through its attorneys, for its counterclaims against Counterclaim-Defendant Talkdesk, states as follows:

### PARTIES

1.      Mitel is a private limited company incorporated under the laws of England and Wales with a principal place of business and registered office at 56 Conduit Street, Mayfair, London, United Kingdom, W1S 2YZ.

2.      Talkdesk is a Delaware corporation with an address at 388 Market Street, Suite 1300, San Francisco, California 94111.

### JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(2) because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interests and costs.

4.      This Court has personal jurisdiction over Talkdesk because it has appeared in this action and because it consented to this Court's jurisdiction pursuant to Section 30 of the Agreement.

5.      Venue is proper in the District of Delaware under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because this Court has personal jurisdiction over Talkdesk.  Talkdesk further waived any objection to venue or inconvenient forum in this District pursuant to Section 30 of the Agreement.

## FACTUAL BACKGROUND

6.     Mitel is a manufacturer of telecommunications equipment whose products include phones, servers, conferencing units, communication software, cloud-based services, contact center solutions, and messaging systems.  Its exceptional commitment to its customers has made it a global market leader in business communications with its cloud, enterprise, and next-gen collaboration applications.

7.     Talkdesk is a cloud contact center solution provider that offers various services, including an enterprise CCaaS solution, a cloud-based contact center software-as-a-service, AppConnect services, and an application programming interface.

**A.     The Master Reseller Agreement**

8.     Wishing to market access to Talkdesk's services either integrated with or for use with Mitel's own solutions to its customers, Mitel entered into an Agreement entitled the "Master Reseller Agreement" (the "Agreement") with Talkdesk on January 31, 2019.

9.     Pursuant to Section 1(a)1 of the Agreement, Talkdesk agreed to integrate the parties' respective solutions so that the parties could offer certain Integrated Services to Mitel's customers for all products and services marketed or sold during the Agreement's sales period. (Agreement § 1(a)1, "Integrated Services" Definition.)

10.     Exhibit C to the Agreement detailed many of the parties' integration expectations. (*Id.* "Integrated Services" Definition.)  Pursuant to Exhibit C, Talkdesk agreed to, among other things, (1) provide a fully white labelled product, documentation, and training as "Mitel" as soon as possible; (2) provide custom white labelling for Mitel's resellers by the end of 2019; and (3) enable tracking of uptime data with Mitel Trust.  (*Id.*, Ex. C §§ 2(a)(5)–(7).)

11.     Exhibit C did not purport to be an exhaustive list of all of Talkdesk's integration obligations though.  Indeed, it contemplated that integration discussions were ongoing and being finalized at the time of its execution.  It therefore required Talkdesk to continue negotiating its integration obligations in good faith and to fully document its entire integration plan within 60 days of the Agreement's execution.  (*Id.*, Ex. C § 1.)

12.     Talkdesk also agreed to provide Mitel with access to its full product offering throughout the first year of the term of the Agreement (and its full term as well), including making all updates and releases of its products available to Mitel as they become available.  (*Id.* § 2(c).)  To the extent any demonstrations of new features and components of the Talkdesk products were required for potential customers, Talkdesk was to provide those demonstrations at no cost to Mitel.  (*Id.* § 1(a)(2).)

13.     Finally, Talkdesk agreed to "always conduct itself in a manner that does not intentionally damage the reputation of Mitel, its products, or the Integrated Service."  (*Id.* § 7(f).)

**B.      Talkdesk breaches multiple obligations under the Agreement.**

14.     Based on the Agreement's provisions, Mitel hoped that its dealings with Talkdesk would develop into a successful and profitable business relationship that would further its goal of providing top-of-the-line services and products to its clients.  However, Talkdesk failed to uphold several terms under the Agreement and continuously failed to perform as required by the Agreement.

15.     The first instance of Talkdesk's failure to perform involved the execution of a full integration plan that was to replace Exhibit C in the Agreement.  Despite Mitel's best efforts, Talkdesk refused to cooperate with Mitel in fully documenting all aspects of the parties' integration plan within 60 days of the Agreement's execution.  The plan was not completed

within the 60-day period contemplated by the Agreement and still has not been completed, even as to items upon which the parties have already agreed.  Further, to the extent certain integration matters were to be the subject of further good faith negotiations, Talkdesk stopped discussing the integration plan required by the Agreement in multiple respects by December 2019.  On a subsequent call to discuss issues about the Talkdesk-Mitel relationship, Talkdesk personnel hung up the phone and refused to discuss these matters further.

16.     In addition to failing to document the integration plan, Talkdesk also did not deliver multiple products and services that are key parts of the Integrated Service to be delivered as required by the Agreement, including as set out in Section 1(a)(1) of the Agreement, further described in Exhibit C to the Agreement.

17.     Talkdesk failed to provide a fully white labelled product, documentation, and training as "Mitel." (*See* Agreement, Ex. C § 2(a)(6).)  During the parties' integration discussions, Talkdesk promised to deliver a fully white labelled product by August 2019.  However, when the August 2019 deadline arrived, Talkdesk refused to perform.  The same is true for Talkdesk's promise to provide custom white labelling for Mitel's resellers by the end of 2019.  (*See id.*, Ex. C § 2(a)(7).)  Indeed, not only did Talkdesk fail to meet the deadline, but it has refused to deliver the products at all.  Less than three months after the Agreement's execution, Talkdesk adopted the position that Mitel's resellers were not entitled to white labelling despite the clear language in the Agreement stating the opposite.  Similarly, Talkdesk has never enabled the tracking of uptime data with Mitel Trust.  (*See id.*, Ex. C § 2(a)(5).)

18.     In addition to those items listed in Exhibit C, Talkdesk also failed to deliver other products and services it promised to deliver during the parties' integration discussions.  For example, Talkdesk promised that French and German translations of its services would be

available in 2019, but those translations have yet to be completed.  The same is true of agent to agent calling, the failed delivery of which has blocked progress on the parties' Integrated Services.

19.     Additionally, Talkdesk has refused to grant Mitel access to Talkdesk's incident management tools.  These actions have prevented Mitel from being able to support Talkdesk's products for Mitel's customers.

20.     Even when Talkdesk did perform its obligations under the Agreement, its performance was marred by significant delays in delivering multiple products and services that are key parts of the Integrated Service as required by the Agreement.  These delays caused significant harm to Mitel and its customers and were in breach of the Agreement's provisions, including the timing agreed to in the Agreement itself or in subsequent promises by Talkdesk. Specific instances of this include delays in (1) UCaaS integration, including UC integration for MiVB and MX-ONE, (2) SIP integration, (3) local presence setup, (4) SMS usage, (5) SIP testing, and (6) creating an administrative portal showing Mitel prices to its customers.

21.     Talkdesk has also failed to make all updates and releases of the Talkdesk Service available to Mitel as they become available in general release.  (*See* Agreement § 2(c).) Throughout the term of the Agreement, this failure has forced Mitel's sales team to demonstrate new features and components of Talkdesk's products on Talkdesk-branded demonstration systems rather than Mitel-branded systems as required by the Agreement.  In addition, in violation of the Agreement, Talkdesk has billed Mitel for these demonstrations, when they are required to be at no cost to Mitel.  (*See id.* § 1(a)(2)(A).)

22.     Further, Talkdesk did not offer Mitel its full range of products as promised despite receiving numerous requests from Mitel over a period of several months and instead pushed a

product inferior to the one it was offering to direct customers, resulting in a service gap between Mitel and its customers.  For example, TalkDesk advertised that it was capable of offering 99.99% uptime to its customers but refused to allow Mitel access to the same SLA it grants to its direct customers.  Instead, Talkdesk only offered Mitel services with a 99.95% uptime, a difference that can result in approximately three and a half hours of additional downtime per year per customer.  Talkdesk's failure to perform therefore prevented Mitel from fully utilizing its own services.  This has resulted in a gap in the SLA between Mitel and Talkdesk and Mitel and its customers.  As a result of the outages and performance issues caused by Talkdesk's refusal to offer its full range of products, Mitel has been forced to either give customers credits or delay customer upgrades, all while Talkdesk has refused to reimburse Mitel for the funds spent because of its breaches of the Agreement.

**C.      Talkdesk engages in improper competitive behavior.**

23.      Of further serious concern, Talkdesk has conducted itself in its dealings with Mitel's own customers in a manner that was improperly competitive with Mitel.  Not only did Talkdesk disparage Mitel and its products, but it also offered products to Mitel's customers that Talkdesk did not allow Mitel to sell.  In direct breach of its obligations to make all its products available to Mitel, Talkdesk reserved the less expensive, most popular versions of its products for itself so that it could redirect current and future customers to purchase products offered exclusively by Talkdesk.

24.      Talkdesk's unlawful competition is evidenced by the number of potential customers registered in Mitel's customer relationship management system that lost interest in purchasing Mitel's products after communicating with Talkdesk personnel.  Upon information and belief, Talkdesk usurped deals that were in Mitel's pipeline by offering potential customers

Talkdesk products at lower prices than the licenses made available for Mitel to offer and by actively offering incentives to Talkdesk personnel who successfully flipped deals to Talkdesk. Based on an initial review of these prospective customers, Mitel estimates that Talkdesk's unlawful conduct has deprived it of at least $1.5 million of value in the originally-anticipated 3-year term of the Agreement (of sales of Talkdesk products alone), with a lifetime value ranging between $3 to $5 million.[1]  This estimate does not include the loss of other associated revenue that Mitel would have earned from those prospective customers.

25.    Talkdesk's misconduct also extended to current Mitel customers, whom Talkdesk poached by promising better pricing and services if the customer directly purchased products from Talkdesk instead of Mitel.[2]

26.    Upon information and belief, Talkdesk intentionally failed to provide Mitel with its full product offering throughout the first year of the term of the Agreement so that it could steal Mitel's customers and prospective customers by offering products to which Mitel was not granted access.  (*See id.* § 2(c).)  For example, Talkdesk did not allow Mitel to sell its Pro and Pro-plus licenses, which were far less expensive for customers to purchase than the licenses that Mitel was allowed to sell.  When Talkdesk personnel saw prospects Mitel had in its sales pipeline, Talkdesk personnel would routinely steal these prospects for themselves by offering the much less expensive licenses.  When Mitel complained about this improper and unlawful sales practice, Talkdesk executives initially denied that these less expensive licenses even existed. Only after the parties entered the Amendment—more than a year into the parties' relationship— did Talkdesk allow Mitel to sell the less expensive (and highest selling) licenses that were

---

[1] Specific potential customer names will be provided pursuant to a Protective Order.
[2] Specific customer names will be provided pursuant to a Protective Order.

required to be made available by the original Agreement.  In another example, Talkdesk confined Mitel to offering a 99.95% uptime product while independently offering products capable of a much higher 99.99% uptime.  Among other things, Talkdesk's practice of offering different service levels of its product to Mitel's customers in competition with Mitel and in refusing to allow Mitel to sell less expensive licenses prevented Mitel from accomplishing the purpose of the Agreement and achieving performance goals set by the Agreement.

**D.    Mitel attempts to save its substantial investment in Talkdesk through amending the Agreement.**

27.    The foregoing breaches (in 2019 and which continued into 2020) left the parties' business relationship in disarray by the end of 2019.  Indeed, Talkdesk acknowledged its breaches and improper conduct in a presentation it gave to Mitel on January 23, 2020 during the MiCC Summit.  In that presentation, Talkdesk stated that there were at least 15 "Open Items" almost a year into the Agreement, including issues related to integration timelines and duties. Talkdesk also admitted that there were at least 10 "Other Issues" that were preventing the parties' mutual success, including two distinct divisions (Talkdesk's and Mitel's) operating in tension as there was conflict in sales channels, Mitel not being allowed to offer the less expensive licenses, disparate SLAs being offered by Talkdesk directly, release management issues, and issues with Talkdesk personnel who were "not accustomed to indirect sales." Talkdesk admitted that it had not made the process easy for Mitel during 2019 and characterized its own 2019 performance negatively.  Indeed, Talkdesk's stated goal for 2020 was to "NOT Repeat 2019."

28.    Wishing to salvage the substantial money, time, and energy Mitel had invested in its dealings with Talkdesk, Mitel entered into discussions with Talkdesk to amend the Agreement in a way that accounted for some of the problems caused by Talkdesk in 2019, including

Talkdesk's failure to allow Mitel access to all of Talkdesk's products.  These efforts culminated in the execution of "Amendment No. 1 to the Master Reseller Agreement" (the "Amendment") on April 1, 2020.

29.     The Amendment changed the original Exhibit A to the Agreement.  The Amendment reaffirmed that Talkdesk was required to provide Mitel with its full product offering and added pricing for different service offerings for Mitel.  Before the Amendment's execution, Talkdesk had refused to allow Mitel access to its most popular (and less expensive) products, thereby hampering Mitel's ability to satisfy any annual minimum goal contemplated in the Agreement's first year.

30.     Additionally, the Amendment altered terms related to certain minimum revenue commitments contemplated during the first three years of the Agreement.  The Amendment states:

> If the integration described in Exhibit C is not available for general commercial release on or before the first anniversary of the effective date of this agreement because of Talkdesk's failure to complete any integration work, the annual commitment for year 2 and year 3 described [in Exhibit A] will not apply and the parties shall negotiate in good faith to reset the annual minimum commitment for year 2 and year 3.  Further, Talkdesk agrees that the annual minimum commitment will not apply to the extent Talkdesk is in breach of its obligations under this agreement, including, without limitation, SLAs and support obligations.

Amendment § 2.

31.     Thus, pursuant to the Amendment, Talkdesk would not be entitled to any annual minimum commitment Mitel might owe if it remained in breach of *any* of its obligations under the Agreement.  Further, the Amendment provided that the annual minimum commitments for Years 2 and 3 (i.e. from April 2020 to April 2021 and from April 2021 to April 2022)—if there were ever any at all—had to be reset to levels that Mitel would agree to in good faith as a result

of Talkdesk's failure to provide the integration described in Exhibit C by the Agreement's first anniversary on January 31, 2020. The Amendment also retained all of Mitel's rights as to Talkdesk's breaches of the Agreement prior to the Amendment's execution.

**E.     Mitel terminates the Agreement based on Talkdesk's material breaches.**

32.     By executing the Amendment, Mitel hoped that Talkdesk would be incentivized to finally honor its contractual obligations. However, Talkdesk continued to underperform. The issues from 2019 persisted, with Talkdesk committing the same breaches as before, including continued delays and failures to provide vital integration services.

33.     Additionally, Talkdesk continued its pattern of refusing to negotiate with Mitel on a plethora of outstanding items. These items included formalizing the integration plan as contemplated by Exhibit C to the Agreement and renegotiating any minimum annual commitments for Years 2 and 3 of the Agreement. Moreover, Talkdesk was nonresponsive when Mitel attempted to contact it regarding the issues listed above that persisted in 2020. Indeed, Talkdesk refused to make changes promised by personnel who had since left Talkdesk, claiming such promises were no longer binding.

34.     These failures directly and materially affected Mitel's ability to provide satisfactory service to its clients and hindered Mitel's ability to compete in the market. And, both individually and collectively, these material breaches prevented Mitel from achieving any of the sales targets set out in the Agreement and Amendment and completely frustrated any ability to prepare new sales targets. In fact, Talkdesk's breaches and stonewalling of communications hindered Mitel's ability to close the existing pipeline of joint deals, which is estimated to be worth far more than any annual minimum commitment Talkdesk might assert it is owed under the Agreement. This forced Mitel to make alternative arrangements mid-sale.

35.     Mitel continued to make its serious concerns known to Talkdesk about its persistent contract breaches through the summer of 2020, but Talkdesk remained non-responsive, even while Talkdesk raised substantial additional funds from investors in July 2020.  In the hopes of rectifying and salvaging the relationship, Mitel was finally able to facilitate a call in August 2020 between the executive leaders of each company, to discuss critical next steps to be taken by Talkdesk.  Despite Mitel's concerted efforts to assist Talkdesk in taking these next steps, the Talkdesk team once again failed to accomplish these steps or to constructively engage with Mitel to work through these outstanding issues.

36.     As a result of Talkdesk's multiple outstanding material breaches and other misconduct, Mitel sent Talkdesk a letter on October 2, 2020 terminating the Agreement.  Mitel also informed Talkdesk that it was not entitled to any alleged minimum annual commitments, to the extent any had accrued, pursuant to Exhibit A, Section 2 of the Amendment.

37.     Mitel has now filed these counterclaims to recover all damages suffered from Talkdesk's wrongful conduct.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

38.     Mitel repeats and realleges the allegations contained in paragraphs 1 through 37 of this Counterclaim as if fully set forth herein.

39.     The Agreement constitutes a valid and legally binding contract between Mitel and Talkdesk, including the Amendment.

40.     Mitel fully performed its obligations under the Agreement and Amendment.

41.     Despite Mitel's performance of its obligations under the Agreement and Amendment, Talkdesk materially breached its obligations under the Agreement and Amendment, including its duty of good faith and fair dealing, at least by:

- Failing to deliver multiple products and services that were key parts of the Integrated Service required to be delivered, including failing to deliver the integration described in Exhibit C for general commercial release by January 31, 2020;

- Significantly delaying in delivering multiple products and services that were key parts of the Integrated Service;

- Failing to fully document the integration plan;

- Failing to make all updates and releases of Talkdesk's services available to Mitel as they became available for general release;

- Failing to provide Mitel with its full product offering throughout the first year the Agreement and afterwards, including all forms of licenses (such as the less expensive Pro and Pro Plus licenses) and SLAs (such as 99.99%);

- Failing to meet SLAs and support obligations; and

- Engaging in improperly competitive behavior with Mitel, including by disparaging Mitel and wrongfully offering Talkdesk's products to Mitel's customers, including in violation of the Agreement's rules of engagement and Talkdesk's duty of good faith and fair dealing.

42.     The effect of Talkdesk's breaches was material.

43.     Accordingly, Talkdesk failed to substantially perform its obligations under the Agreement and Amendment.

44.     As a result of Talkdesk's various material breaches of the Agreement and Amendment and failure to substantially perform its obligations under the Agreement and Amendment, Mitel has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Business Relations)

45.     Mitel repeats and reallege the allegations contained in paragraphs 1 through 44 of this Counterclaim as if fully set forth herein.

46.     As set forth more fully above, Mitel had existing contracts with its customers.

47.    Talkdesk knew about those contracts because of the Agreement.

48.    Talkdesk intentionally interfered with those business relationships by soliciting Mitel's customers and by inducing them to breach their contracts with Mitel and purchase products directly from Talkdesk.

49.    Talkdesk's conduct was improper because Talkdesk wrongfully took advantage of the access it was given to Mitel's customers under the Agreement to advance its own business interests at Mitel's expense.  Further, pursuant to the Agreement, Talkdesk was forbidden from disparaging Mitel or its products, but it did exactly that by persuading Mitel customers to purchase products exclusively from Talkdesk rather than Mitel.

50.    Mitel's business relationships have suffered as a result, causing (among other things) Mitel to lose business.  As a result, Mitel has been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Tortious Interference with Prospective Business Relations)

51.    Mitel repeats and realleges the allegations contained in paragraphs 1 through 50 of this Counterclaim as if fully set forth herein.

52.    As set forth more fully above, Mitel had multiple prospective business relationships with potential customers who were actively in discussions with Talkdesk to purchase Mitel's products.

53.    Talkdesk intentionally interfered with those prospective business relationships by soliciting Mitel's potential customers and by inducing them to purchase products directly from Talkdesk instead of from Mitel.

54.    Talkdesk's conduct was improper because Talkdesk wrongfully took advantage of the access it was given to Mitel's potential customers under the Agreement to advance its own

19

business interests at Mitel's expense.  Further, pursuant to the Agreement, Talkdesk was forbidden from disparaging Mitel or its products, but it did exactly that by persuading Mitel's potential customers to purchase products exclusively from Talkdesk rather than Mitel.

55.     Mitel's business has suffered as a result, causing (among other things) Mitel to lose potential customers.  As a result, Mitel has been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment)

56.     Mitel repeats and realleges the allegations contained in paragraphs 1 through 55 of this Counterclaim as if fully set forth herein.

57.     Pursuant to Delaware Declaratory Judgment Act (Del. Code tit. 10, § 6501 *et seq.*), Mitel requests that the Court determine the existing rights and status of the parties under the Agreement and Amendment.

58.     Mitel contends that Talkdesk has breached its material obligations under the Agreement and Amendment, thereby justifying Mitel's termination of the Agreement and absolving Mitel of any alleged obligation to pay Talkdesk any minimum annual commitments under the Agreement and Amendment.

59.     Talkdesk disagrees with Mitel's contentions.  Therefore, a justiciable controversy exists between the parties.

60.     The controversy between Mitel and Talkdesk will be resolved by this Court's declaration that: (1) Talkdesk materially breached the Agreement and Amendment; (2) Mitel's termination of the Agreement was valid; and (3) Talkdesk is not entitled to recover any annual minimum commitments.

## DEMAND FOR JURY

61.     Pursuant Rule 38 of the Federal Rules for Civil Procedure and consistent with Talkdesk's Complaint, Mitel hereby demands a trial by jury for all issue that are so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Mitel demands that judgment be entered in its favor against Talkdesk as follows:

(i)     awarding Mitel all actual, consequential, and punitive damages to which it shows itself to be entitled and in an amount currently undetermined but believed to be in excess of the damages claimed by Talkdesk, plus an award of interest;

(ii)    granting declaratory relief that: (1) Talkdesk materially breached the Agreement and Amendment; (2) Mitel's termination of the Agreement was valid; and (3) Talkdesk is not entitled to recover any alleged annual minimum commitments;

(iii)   awarding Mitel the costs and expenses incurred in this action; and

(iv)    awarding Mitel such other and further relief as the Court may deem just and proper.

Dated:  December 30, 2020

OF COUNSEL:

David H. Harper
*david.harper@haynesboone.com*
Ryan N. Gardner
*ryan.gardner@haynesboone.com*

HAYNES & BOONE LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
214-651-5000  Telephone
214-651-5940  Facsimile

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
farnan@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, DE 19801
(302) 651-7705

**ATTORNEYS FOR DEFENDANT
MITEL NETWORKS
(INTERNATIONAL) LTD.**